**UNITED STATES of America,**
**Appellee,**

v.

**Anthony JOHNSON, Appellant.**

**No. 09–2245.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
LAR 34.1(a) Dec. 1, 2009.

Filed: Jan. 27, 2010.

---

Michael A. Consiglio, Eric Pfisterer, Office of United States Attorney, Harrisburg, PA, Attorneys for Appellee.

Frederick W. Ulrich, Office of Federal Public Defender, Harrisburg, PA, Attorney for Appellant.

Before: FISHER, HARDIMAN and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

In this appeal we consider whether a vehicle stop based on information provided by a witness who called 911 to report a shooting violated *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As we shall explain, the vehicle stop was supported by reasonable suspicion that at least one of its occupants was involved in the shooting. In addition, the police officers' conduct in effectuating the stop was reasonable under the circumstances. Accordingly, the District Court did not err when it denied Appellant Anthony Johnson's motion to suppress evidence.

### I.

A hard rain was falling in Harrisburg, Pennsylvania on the night of January 7, 2007 when Tammy Anderson noticed a taxicab pull into a parking lot across the street from her house and park next to a van. Though visibility was poor, Anderson was able to observe what appeared to be two men emerge from the vehicles and begin to fight. Watching this altercation develop from the doorway of her home, Anderson heard at least one gunshot ring out.

Upon hearing the gunshot, Anderson called 911 and told the police dispatcher: "I heard a gunshot. I seen [sic] two people wrestling on the ground and I don't see them now. And there was a gunshot. I'm standing here on [sic] my front door." When prompted by the dispatcher, Anderson provided her full name, her telephone number, and described the location of the parking lot. Although Anderson was unable to describe in any detail the individuals involved in the altercation, she said the taxi appeared to be white—possibly with tan paneling—and had a green light on its roof. While she was still on the phone, Anderson told the dispatcher that the taxi was departing from the parking lot and heading southbound on Seventh Street. The van, Anderson noted, remained in the lot and appeared to be unattended.

The information Anderson provided was dispatched to Harrisburg police officers on patrol that evening. Officer John Doll responded to the parking lot and confirmed that a van was parked in the lot. Doll arrived so quickly that Anderson, who was still on the phone, told the dispatcher that she saw a police car drive by. At about the same time, another officer reported that he had spotted a taxicab matching the description provided by Anderson heading southbound on Seventh Street approximately ten blocks away. After determining that no one remained with the van, Officer Doll proceeded southbound on Seventh Street in search of the taxicab.

Doll quickly tracked down the taxi, though he did not stop the vehicle immediately. Concerned that its occupants might be armed, Doll and other officers followed the taxi for several blocks to allow backup to join the pursuit. When the taxi turned onto Aberdeen Street, a narrow alleyway approximately two miles from the reported altercation, the officers initiated a traffic stop. The purpose of this stop, Doll testified at the suppression hearing, was to investigate the "shots fired call" and to ensure that no one in the taxicab was either armed or injured. Positioning their vehicles to block the exit to the alleyway, numerous officers surrounded the taxicab. Because the information relayed by the dispatcher indicated that the occupants of the taxi may have been involved in the reported shooting incident, the officers ap-

proached the taxicab slowly, with guns drawn, while shouting for the occupants to exit the vehicle. According to Doll, such a response was "general practice" in such circumstances "in case somebody comes out of the vehicle with a gun ready to shoot."

The police proceeded to clear and secure the vehicle. Riding in the backseat of the taxi with his young son was the Appellant, Anthony Johnson. After removing both Johnson and the taxi driver, Kenneth Cobb, the officers handcuffed both men, though neither was formally arrested at that time. Rather, Officer Doll testified at the suppression hearing that the police handcuffed the men so the officers could safely clear the vehicle and gather information about the shooting reported by . Anderson. Surprised to discover Johnson's eight-year-old son in the taxicab, the officers also removed him and placed him to the side.

After Johnson and Cobb were detained, another responding officer, Richard Gibney, approached the car. Though it was raining hard, the location was well-lighted and the taxicab's interior dome light was on, illuminating the vehicle's passenger compartment. Looking through a back window, Officer Gibney observed the butt of a Taurus .38 Special revolver protruding from an unzipped duffel bag on the taxicab's rear seat, where Johnson had been sitting. After consulting with Officer Doll, Officer Gibney retrieved the weapon from the taxi and unloaded it, finding two spent shell casings inside.

Officer Doll then placed Johnson, a convicted felon, under arrest for possession of the gun and suspected involvement in the shooting and altercation reported by Anderson. After reading Johnson his *Miranda* rights, Doll began questioning him about the firearm and the shooting. Johnson declined to respond. A search of Johnson incident to his arrest revealed that he carried on his person marijuana, cocaine, and related drug paraphernalia.

Johnson was transported to the police station for booking, where he again encountered Officer Doll, who had traveled to the station separately. Although Doll did not attempt to question Johnson at the police station, Johnson began speaking to Doll during the booking process, admitting ownership of the revolver and duffel bag but denying responsibility for the shooting reported by Anderson. Johnson also attempted to persuade Doll to forego charging him with any drug offenses.

A grand jury indicted Johnson on a single count of illegal possession of a firearm by a person with three prior felony convictions in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). After Johnson pleaded not guilty, the Government filed a superseding indictment, adding a single count of possession with the intent to distribute marijuana and cocaine in violation of 21 U.S.C. § 841(a)(1). Johnson then filed the motion to suppress at issue in this appeal, contending that the firearm, drugs, and any inculpatory statements made to Doll should be suppressed because the initial stop of the taxicab violated the Fourth Amendment's prohibition against unreasonable searches and seizures. After the District Court denied his motion, Johnson conditionally pleaded guilty to violating 18 U.S.C. §§ 922(g)(1) and 924(e), reserving his right to appeal the District Court's denial of his motion to suppress. The District Court sentenced Johnson to 180 months incarceration and imposed a fine of $1,000, together with four years of supervised release.

## II.

Johnson now appeals the District Court's denial of his motion to suppress. The District Court had jurisdiction pursu-

ant to 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

On appeal, Johnson claims the initial stop of the taxi was unconstitutional for two independent reasons. First, he argues that the stop of the taxi amounted to a *de facto* arrest which required probable cause that the information provided by Anderson could not provide. Alternatively, Johnson argues that the stop of the taxicab was not supported by reasonable suspicion because the information provided by Anderson was insufficiently detailed, particularized, and reliable. Examining the District Court's factual findings for clear error, *United States v. Bonner,* 363 F.3d 213, 215 (3d Cir.2004), and exercising *de novo* review over the District Court's legal determination that the seizure at issue here did not violate the Fourth Amendment, *United States v. Myers,* 308 F.3d 251, 255 (3d Cir.2002) (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)), we address Johnson's arguments in turn.

### III.

 The Fourth Amendment prohibits "unreasonable searches and seizures...." U.S. Const. amend. IV. A traffic stop of a motor vehicle is a seizure of the vehicle's occupants for the purposes of the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Mosley,* 454 F.3d 249, 253 (3d Cir.2006). Ordinarily, "for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson,* 305 F.3d 164, 167 (3d Cir.2002). Under the well-established exception to the warrant requirement set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d

889 (1968), however, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *see also Prouse,* 440 U.S. at 663, 99 S.Ct. 1391 (stop of vehicle must be based on reasonable suspicion of criminal activity). Evidence obtained as the result of a *"Terry* stop" "that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" *United States v. Brown,* 448 F.3d 239, 244 (3d Cir.2006) (citing *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

### A.

 Johnson first contends that the evidence recovered from the taxicab and his statements to the police must be suppressed because the initial stop of the vehicle was not supported by probable cause.[1] Though Johnson acknowledges that police officers ordinarily may stop a vehicle based on reasonable suspicion alone, *see Prouse,* 440 U.S. at 663, 99 S.Ct. 1391; *United States v. Johnson,* 63 F.3d 242, 245 (3d Cir.1995), he argues that probable cause was required here because the manner in which the stop was conducted transformed the encounter into a formal arrest. Specifically, Johnson notes that the police encircled the taxicab, drew their weapons, yelled at the occupants, and later handcuffed Johnson and Cobb without first questioning them or checking their identification.

 In certain circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be

---

1. Johnson does not contend that the statements he made during this interaction with Officer Doll should be suppressed under *Mi-*

*randa v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

supported by probable cause. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (observing that case law "may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest"). We do not find Johnson's appeal to present such a case, however. We have recognized that "the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Edwards,* 53 F.3d 616, 619 (3d Cir.1995) (collecting cases). Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest. *Baker v. Monroe Twp.,* 50 F.3d 1186, 1193 (3d Cir.1995) ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest."); *Torres v. United States,* 200 F.3d 179, 185 (3d Cir.1999) ("[I]n certain circumstances officers lawfully may handcuff the occupants of the premises while executing a search warrant.").

We likewise find unpersuasive Johnson's argument that the stop constituted a *de facto* arrest because the police did not question the taxi's occupants or check their identification before ordering them from the vehicle and handcuffing them. In *Terry,* the Supreme Court recognized that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23, 88 S.Ct. 1868. Accordingly, the Supreme Court noted:

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating . . . is armed and presently dangerous to the officer or to others, it would . . . be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Id.* at 24, 88 S.Ct. 1868. Here, the Harrisburg police, acting on a credible tip that at least one of the taxi's occupants was armed and dangerous, took reasonable steps to ensure that the scene was secure before investigating further. *See* Part III.B—C, *infra.* That the police did not first engage the taxi's occupants in conversation or check their driver's licenses did not transform the stop into a *de facto* arrest.

In light of the foregoing, we conclude that nothing about the conduct of the Harrisburg police in this case rises to the level that we have previously required to constitute a *de facto* arrest under the Fourth Amendment. Accordingly, we decline Johnson's invitation to subject the stop of the taxicab to the probable cause standard. Instead, we will evaluate whether the Harrisburg police had reasonable suspicion to stop the taxi and question its occupants regarding the shooting reported by Anderson. *See Prouse,* 440 U.S. at 663, 99 S.Ct. 1391; *Johnson,* 63 F.3d at 245.

### B.

Having ascertained the appropriate legal standard, we now consider the primary issue presented in Johnson's appeal: whether the District Court erred when it held that the *Terry* stop of the taxicab was supported by reasonable suspicion. *Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868; *see also United States v. Delfin–Colina,* 464 F.3d 392, 397 (3d Cir.2006) (reaffirming that the *Terry* reasonable suspicion standard applies to routine traffic stops). Johnson argues that it was not, contending that Anderson's 911 call provided the Harrisburg police with insufficient information to justify an investigative stop. When assessing whether the vehicle stop was supported by reasonable suspicion, we must

consider the "totality of the circumstances to determine whether 'the detaining officers ... [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir.2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). In assessing whether the officers' suspicions regarding the taxicab and its occupants were based on sufficiently reliable facts, the knowledge of the dispatcher to whom Anderson made her report "is imputed to the officers in the field." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir.2008).

▮▮▮ Here, the stop of the taxi and the seizure of its occupants were based almost exclusively on the information Anderson provided to the police. When a *Terry* stop is based on a tip provided by an informant, we must scrutinize the informant's "veracity, reliability, and basis of knowledge" to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop. *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)) (internal quotation marks omitted). Several factors inform our assessment of the reliability of an informant's tip, including whether:

(1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility;

(2) the informant can be held responsible if her allegations are untrue;

(3) the information would not be available to the ordinary observer;

(4) the informant has recently witnessed the criminal activity at issue; and

(5) the witness's information accurately predicts future activity.

*See id.* at 211 (citing *Brown*, 448 F.3d at 249–50). Though these factors all are relevant to our analysis, no single factor is dispositive or even necessary to render an informant's tip reliable. *Id.* at 213 ("[A] tip need not bear all of the indicia—or even any particular indicium—to supply reasonable suspicion."). Thus, we must look to the totality of the circumstances to determine whether Anderson's 911 call had "sufficient indicia of reliability ... for us to conclude that the officers possessed an objectively reasonable suspicion" to justify the stop of the cab. *Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690; *Brown*, 448 F.3d at 250.

Evaluating the totality of the circumstances in this case, we have little trouble concluding that the stop was supported by reasonable suspicion. Anderson—an innocent, uninvolved bystander—called 911 to report an ongoing altercation that involved gunfire. Though she did not speak face-to-face with a police officer, she freely and repeatedly provided the police dispatcher with her name and telephone number, and the location of her home. These data points enhanced Anderson's credibility and the reliability of her report by allowing the police to hold her responsible if her tip ultimately proved false. *See Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir.2002). Indeed, the information Anderson provided here was more detailed than in *Torres*, where we noted that an informant's reliability was enhanced because he identified himself by telling a police dispatcher "that he was driving a green taxicab from a specified company." 534 F.3d at 212.

The details of Anderson's 911 call also made clear that she was reporting not just recent, but *ongoing* criminal activity that she was observing during her emergency call. *See Nelson*, 284 F.3d at 480. This allowed the police to conclude that Anderson had a reliable basis—namely, her eyewitness observations—for the in-

formation she was relaying to the dispatcher. *See United States v. Valentine,* 232 F.3d 350, 354 (officers' knowledge that informant was "reporting what he had observed moments ago" enhanced reliability of tip); *Torres,* 534 F.3d at 211 (that detailed tip was relayed to 911 dispatcher in "play-by-play" fashion supported finding of reliability). Anderson's tip also described the color of the taxicab and noted that it had a distinctive green light on top.[2] *See White,* 496 U.S. at 332, 110 S.Ct. 2412 (level of detail of information provided can enhance an informant's credibility); *Nelson,* 284 F.3d at 483 (detailed information regarding, model, color, and other distinctive characteristics of vehicle supported reliability of information provided by anonymous informant). Finally, Anderson correctly noted that the taxi would be heading south on Seventh Street, which is exactly where it was first spotted by the police. *See White,* 496 U.S. at 332, 110 S.Ct. 2412 (reliability of tip enhanced because it accurately predicted defendant's future behavior); *Torres,* 534 F.3d at 212 (reliability of tip supported by fact that it accurately predicted that a particular type of vehicle would be driving near a certain location).

 The reliability of an informant's tip can be enhanced further by independent police corroboration of the information provided. *White,* 496 U.S. at 329–31, 110 S.Ct. 2412. Here, important aspects

of Anderson's tip were corroborated by the police. After describing the altercation to the 911 dispatcher, for example, Anderson reported that although the taxicab had departed, the van remained parked in the lot. This information was confirmed by Officer Doll, who drove by the lot and observed the unattended van before proceeding down Seventh Street to intercept the taxicab. Furthermore, the 911 operator corroborated some of the details of Anderson's initial report, testifying at the suppression hearing that she was very familiar with the area Anderson was describing. And finally, the police also confirmed that a white taxi with a green light on its roof was traveling southbound on Seventh Street, just as Anderson had stated. That the police were only able to corroborate innocent details of Anderson's tip is immaterial. *See United States v. Ritter,* 416 F.3d 256, 272 (3d Cir.2005) ("The police corroboration of the anonymous tip's innocent details, the cases teach, bolsters the veracity and reliability of the tip. . . ."). The police's corroboration of certain aspects of Anderson's tip further enhanced the reliability of the information that she provided to the police.

In claiming that the police lacked reasonable suspicion to stop the taxi, Johnson relies principally on the decision of the Court of Appeals for the Fifth Circuit in *United States v. Jaquez,* 421 F.3d 338 (5th

2. In its analysis of whether the police possessed reasonable suspicion to stop the taxi, the District Court credited the information provided by Anderson in part because she accurately "described [the cab's] most distinctive feature—the green light." App. at 138. Johnson now argues that the stop of the taxi was not supported by reasonable suspicion because while Anderson indicated that the taxi she observed had a green roof light, the taxi in which he rode had a white roof light. Appellant's Op. Br. at 19. When questioned on this point at the suppression hearing, the taxi driver, Kenneth Cobb, was far from cer-

tain, testifying that he "assum[ed] it was a white light" and indicating that he "didn't recall it being green or anything like that." App. at 103. Conversely, testimony from the officers involved in the stop suggested that the taxicab's roof light was, in fact, green. App. at 69–70. Given Cobb's equivocal suggestion that the light was actually white, coupled with the fact that Cobb and Johnson were longtime friends and coworkers who had served prison time together, App. at 103–05, the District Court's decision to reject Cobb's description of the color of the light was not clearly erroneous. *See Bonner,* 363 F.3d at 215.

Cir.2005) (per curiam). In *Jaquez*, an officer received a report indicating only that "a red car" had been involved in a shooting in a high-crime neighborhood. 421 F.3d at 340. Approximately fifteen minutes later, the officer stopped a red car traveling away from the general area where the shots reportedly had been fired. *Id.* A consent search revealed that the car's driver, a convicted felon, was carrying a loaded firearm. The Fifth Circuit reversed the district court's denial of the defendant's motion to suppress the firearm, noting that the officer had no information tying the stopped vehicle to the reported shooting other than the car's color and general location. Such "sparse and broadly generic information," the court concluded, was insufficient to provide the officer with the reasonable suspicion necessary to justify the initial stop of the defendant's vehicle. *Id.* at 341.

The detailed information reported by Anderson—coupled with the officers' independent corroboration of certain aspects of her tip—plainly distinguishes this appeal from *Jaquez*. Unlike the report in *Jaquez*, Anderson's description of the vehicle was specific, providing the police with both the color and type of car involved in the shooting—a white taxi cab—and identifying one of its most distinctive features, a green roof light. *See Nelson*, 284 F.3d at 481 (reasonable suspicion existed for stop partly because a "gray BMW with a tag in the back window ... matched precisely" the information relayed to officers); *cf. Jaquez*, 421 F.3d at 341 (finding that officer lacked reasonable suspicion in part because the tip provided no information regarding the "make or model" of the stopped vehicle). The sparse tip in *Jaquez* also lacked any predictive value, indicating only that a particular color car was in a certain neighborhood fifteen minutes prior to the stop. Here, by contrast, Anderson accurately predicted that the taxicab would be traveling south on Seventh Street. *See*

*Torres*, 534 F.3d at 212 (tip indicating that a car of a certain make and color would be driving in a particular location provided reasonable suspicion to stop the vehicle because it "accurately predicted what would follow"). Moreover, the taxi in which Johnson was riding was spotted and stopped just minutes after Anderson's 911 call was initiated, much sooner than the stop of the car in *Jaquez*. And finally, unlike *Jaquez*, Anderson's 911 call was more than a mere tip. As we noted previously, it was an eyewitness account provided by one who gave her name and could be held responsible if the information was untrue. Accordingly, Johnson's attempt to analogize the detailed and predictive information provided by Anderson to the bare-bones tip found lacking by the Fifth Circuit in *Jaquez* is unavailing.

Considering the totality of the circumstances, we conclude that Anderson's tip, bolstered by the officers' independent corroboration of certain details, was sufficiently reliable to provide the police with reasonable suspicion that the occupants of the taxicab in which Johnson was riding had been involved in the shooting reported by Anderson. Therefore, we hold that the officers' decision to stop the taxi was "justified at its inception" in the present case. *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868.

### C.

 A *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution. *United States v. Rickus*, 737 F.2d 360, 366 (3d Cir.1984); *see also Terry*, 392 U.S. at 28, 88 S.Ct. 1868 ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all."). As discussed previously, Johnson devotes

most of his brief to arguing that the officers' conduct subjected him to a *de facto* arrest that was unsupported by probable cause. *See* Part III.A, *supra.* However, an excessively intrusive *Terry* stop is not unconstitutional because its overly broad scope necessarily places a suspect under *de facto* arrest without probable cause, as Johnson suggests here. Rather, an improperly executed *Terry* stop violates the Fourth Amendment because its scope is generally unreasonable under all of the circumstances. *See Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868; *Baker,* 50 F.3d at 1192 ("Under the *Terry* cases, the reasonableness of the intrusion is the touchstone. . . .").

Recognizing this, the Supreme Court in *Terry* emphasized that "our inquiry is a dual one" when assessing the constitutionality of an investigative detention such as the one at issue in this case. 392 U.S. at 19–20, 88 S.Ct. 1868. First, we examine "whether the officer's action was justified at its inception"—that is, whether the stop was supported by reasonable suspicion at the outset. *Id.* In the present case, it clearly was. *See* Part III.B, *supra.* Next, we determine whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868; *see also Goodrich,* 450 F.3d at 558, 558 n. 6 (explaining that the "validity of the initial stop" and the "reasonableness or intrusiveness of the investigation" require separate analyses).

■ Here, Johnson misdirects his criticism of the police officers' conduct when he argues under step one that he was subjected to a *de facto* arrest by the Harrisburg police. Our cases indicate, however, that such complaints are more properly considered during the second step of the *Terry* analysis, when we scrutinize the relative intrusiveness of the officers' conduct. *See,*

*e.g., Edwards,* 53 F.3d at 619 (analyzing defendant's argument that he was subject to a *de facto* arrest during *Terry* stop by considering the reasonableness of the stop in light of the circumstances that justified it). Thus, we review the manner in which the Harrisburg police conducted the *Terry* stop at issue here to determine whether it was reasonably related in scope to the initial justification for the stop and the officers' legitimate concerns for the safety of themselves and the general public. *Terry,* 392 U.S. at 19–20, 24–25, 88 S.Ct. 1868; *Sharpe,* 470 U.S. at 685–87, 105 S.Ct. 1568.

■ In *Terry,* the Supreme Court emphasized that a police officer conducting an investigative stop has an "immediate interest . . . in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." 392 U.S. at 23, 88 S.Ct. 1868. Accordingly, when an officer has a reasonable basis for "believing that the individual . . . is armed and presently dangerous," he may "take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* Ultimately, our scrutiny of the Harrisburg police officers' actions in stopping the cab and removing its occupants must focus on the overall reasonableness of their conduct in light of all the circumstances. *Edwards,* 53 F.3d at 619; *Baker,* 50 F.3d at 1192 ("Under the *Terry* cases, the reasonableness of the intrusion is the touchstone. . . .").

■ Johnson's chief complaint regarding the manner in which the stop was executed is that the police officers surrounded the vehicle, drew their weapons, shouted at the taxicab's occupants, and subsequently handcuffed both him and Cobb. We have previously recognized that the "use of guns and handcuffs must be justified by the circumstances" that au-

thorize an investigative detention in the first place. *Baker,* 50 F.3d at 1193. This requirement was clearly met in the instant case. The officers responding to Anderson's 911 call reasonably suspected that the taxi's occupants had been involved in a physical altercation and shooting just minutes before. *See* Part III.B, *supra.* An officer with reasonable suspicion that the occupants of a vehicle are armed and dangerous does not act unreasonably by drawing his weapon, ordering the occupants out of the vehicle, and handcuffing them until the scene is secured. *See, e.g., United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989) (finding that police officers with reasonable suspicion that suspects were armed acted reasonably in drawing their weapons and handcuffing suspects). Nor are we troubled by the fact that the officers shouted at the taxicab's occupants. *See Baker,* 50 F.3d at 1192 (noting that police may order a suspect to "get down" during a *Terry* stop). Because the officers had specific, reliable facts indicating that at least one of the taxicab's occupants had been involved in a shooting just minutes before, the Fourth Amendment's requirement that a *Terry* stop be conducted in a reasonable manner was clearly met.

In sum, the Harrisburg police officers took only "such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Edwards,* 53 F.3d at 619. We therefore conclude that the *Terry* stop of the taxicab in which Johnson was a passenger, in addition to being supported by reasonable suspicion, was also "reasonably related in scope to the circumstances which justified the [stop] in the first place." *Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868.

## IV.

For the foregoing reasons, the District Court did not err when it held that Johnson's Fourth Amendment rights were not violated. Accordingly, we will affirm Johnson's judgment of conviction.