NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3240
_____

STANLEY SUMMERVILLE; FOMBAH SIRLEAF,

v.

COLONEL JOSEPH RICK FUENTES; DETECTIVE SERGEANT MICHAEL
GREGORY, badge #6032; DETECTIVE SERGEANT J. GAUTHIER, badge #5593;
LIEUTENANT J. HARRISON, badge #5277; DETECTIVE SERGEANT FIRST CLASS
P. CIANO, badge #5133; DETECTIVE E. BOBAL, badge #6775; DETECTIVE
SERGEANT T. KELSHAW, badge #6231; DETECTIVE R. JOAQUIN, badge #6853;
DETECTIVE P. CHARIAMONTE, badge #6348
Detective Sergeant Michael Gregory,
                                        Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 2-14-CV-07653)
District Judge:  Hon. Kevin McNulty
_____

Argued on March 17, 2021
_____

Before: KRAUSE, PHIPPS, and FUENTES, *Circuit Judges*

(Filed: September 10, 2021)
_____

Adam Gibbons
Matthew J. Lynch                            [**ARGUED**]
Office of Attorney General of New Jersey
Division of Law
25 Market Street
R.J. Hughes Justice Complex
1st Floor, West Wing
Trenton, NJ 08625

      *Counsel for Appellant*

Gerald Graves                                **[ARGUED]**
J. Graves Associates
4 South Orange Avenue, #117
South Orange, NJ 07079

      *Counsel for Appellees*

_____

OPINION[*]
_____

PHIPPS, *Circuit Judge*.

This case is about timing – bad timing and prolonged timing – for two Liberian nationals, lawfully present in the United States. Those men, Fombah Sirleaf and Stanley Summerville, were loading suitcases in a vehicle at a New Jersey outlet mall parking lot while a drug deal took place one lane over. Law enforcement officers detained them for roughly 90 minutes in connection with that crime, which they did not commit.

Based on the apprehension itself as well as its duration, Sirleaf and Summerville sued several officers individually under 42 U.S.C. § 1983 for violating their Fourth Amendment rights. The District Court had federal-question and civil-rights jurisdiction

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

over their claims. *See* 28 U.S.C. §§ 1331, 1343. After discovery, the officers moved for summary judgment and invoked qualified immunity. The District Court granted many aspects of the officers' motion but denied qualified immunity to the officer overseeing the investigation, Detective Michael Gregory.

Through this interlocutory appeal, Detective Gregory challenges that order denying him qualified immunity. As explained below, qualified immunity excuses Detective Gregory for his role in the initial stop and two segments of the 90-minute detention, but more specific findings are necessary regarding the middle 30 or so minutes of that time period. Thus, we will reverse in part and vacate and remand in part the District Court's order.

## I.

On October 21, 2014, a team of New Jersey law enforcement officers were pursuing a lead from a confidential source about a heroin transaction. Officers surveilled and followed the suspect, Richard Parker, who was driving a white Lexus, from his work to his home, and eventually to an outlet mall, where he parked in a crowded lot.

At the same time, in the same parking lot, about thirty feet away, across the driving lane, were Sirleaf and Summerville. They were outside of a black Mercedes SUV loading suitcases with several objects. Those actions caught the attention of the eight-member team of law enforcement officers who were monitoring Parker. No one on that team noticed any communications, however, between Parker and Sirleaf or Summerville.

But Parker was communicating with someone in the parking lot. An occupant from the car next to his entered the Lexus for about 20 seconds, exited, and drove off.

3

Shortly afterwards, Parker started to drive away, and Detective Gregory then ordered that everyone remaining on the scene – Parker, Sirleaf, and Summerville – be detained. In searching Parker's car, officers found a duffle bag with 200 bricks of heroin and $1,400 cash. Officers also approached Sirleaf and Summerville on foot with guns drawn and ordered them to lie down on the ground. Officers frisked them for weapons, handcuffed them, and questioned them for about ten minutes regarding Parker and the drug deal.

But as the officers learned, Sirleaf and Summerville had nothing to do with the drug deal. Sirleaf explained to the officers that he arrived from Liberia the day before, was the director of the national law enforcement organization there, had traveled to the United States to look at military equipment, and had assisted United States law enforcement in the past. Both Sirleaf and Summerville described that they were packing suitcases with a large volume of over-the-counter drugs to transport to Liberia to assist with the Ebola outbreak. The officers requested to search the car, and Summerville consented. By the time that search was completed and yielded nothing suspicious, Sirleaf and Summerville had been detained over 30 minutes.

Detective Gregory then went with another officer to the mall security office to review surveillance video footage to confirm Sirleaf and Summerville were not involved with Parker. That venture took approximately 30 minutes, but afterwards Detective Gregory was convinced that Summerville and Sirleaf were not involved in any narcotics transaction. He then instructed the officers on the scene that they could release Sirleaf and Summerville if they had no further reason to detain them.

At that point, one of the officers on the scene, Detective Marc Friedenberger, who has not been sued in this case, continued to detain Sirleaf and Summerville. He did so to call the FBI's Joint Terrorism Task Force to verify Sirleaf's story regarding his citizenship and occupation given at the initial questioning. That 30-minute inquiry produced nothing irregular. With that information, and after 90 minutes of detention, the officers released Sirleaf and Summerville.

## II.

Section 1983 permits suits against persons acting under color of state law for violating federal rights. *See* 42 U.S.C. § 1983. The doctrine of qualified immunity insulates individual-capacity defendants from § 1983 liability in two potentially overlapping instances: when their challenged actions do not violate a federal right and when such a right is not clearly established. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A denial of qualified immunity – to the extent it is premised on an issue of law – is immediately reviewable on appeal under the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 . . . ."). Through this timely interlocutory appeal, Detective Gregory challenges two legal aspects of the District Court's denial of qualified immunity: that neither the initial detention nor its length violated clearly established Fourth Amendment rights.

The Supreme Court has emphasized that for a constitutional right to be clearly established, it must be defined with a high degree of specificity. *See District of Columbia*

5

*v. Wesby*, 138 S. Ct. 577, 590 (2018); *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). A clearly established right "must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (internal quotation marks omitted). In some contexts, such as excessive force claims, where the constitutional right depends heavily on circumstances, *see, e.g.*, *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), the degree of specificity must be greater to ensure that only plainly incompetent law enforcement officers and those who knowingly violate the law are excluded from qualified immunity. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam); *El v. City of Pittsburgh*, 975 F.3d 327, 336 (2020).

A violation of Fourth Amendment rights related to a detention, although still highly dependent on circumstances, does not hinge on the same degree of factual detail as other Fourth Amendment violations. It is clearly established that law enforcement officers may briefly detain a person if they have a reasonable, articulable suspicion that criminal activity is afoot. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010). That standard is objective (based on a reasonable officer) not subjective (based on the specific officer). *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). In assessing the reasonableness of the detention, courts consider the totality of the circumstances, but "[a]n individual's presence in an area of expected criminal activity, standing alone, is not

6

enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124. Similarly, it is clearly established that, although several factors bear on the constitutionality of a detention's duration, officers must act with reasonable diligence and may not unreasonably delay in confirming or dispelling their suspicions of criminal activity. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) (explaining that police must diligently investigate to "confirm or dispel their suspicions quickly"); *see also United States v. Place*, 462 U.S. 696, 709 (1983) (accounting for "whether the police diligently pursue[d] their investigation" in assessing the length of the detention); *Johnson*, 592 F.3d at 452 (evaluating "whether the manner in which the stop conducted was 'reasonably related in scope to the circumstances which justified the interference in the first place'" (quoting *Terry*, 392 U.S. at 19–20)).

A. *The Basis for the Detention*

The initial detention of Sirleaf and Summerville did not violate their clearly established Fourth Amendment rights. Evaluated objectively, Detective Gregory had a reasonable, articulable suspicion to detain them. As a matter of law, such a suspicion could not arise merely because the men were nearby a suspected drug deal. *See Wardlow*, 528 U.S. at 124. But here, their actions – loading and unloading suitcases outside of a car – were consistent with them having a role in that nearby drug transaction, either as participants or as look-outs. The open factual issue identified by the District Court – whether Detective Gregory knew that a hand-to-hand drug deal actually took place – does not prevent that conclusion. Due to Sirleaf and Summerville's proximity to a suspected drug deal and their unusual activity consistent with involvement in that

7

undertaking, a reasonable, articulable suspicion existed with or without the additional knowledge that a drug deal had transpired. *See, e.g.*, *Terry*, 392 U.S. at 29–31 (holding that a brief stop-and-frisk did not violate the Fourth Amendment – even without the officer's knowledge that a crime had actually been committed). Thus, as a matter of law, the initial stop did not violate Sirleaf or Summerville's clearly established Fourth Amendment rights.

### B. *The Length of the Detention*

Sirleaf and Summerville also sued Detective Gregory for the overall length of the detention. Although 90 minutes is a long time for a 'brief' stop, Detective Gregory contends that precedent does not clearly establish that 90 minutes is categorically too long. If the analysis consisted of only that consideration, then Detective Gregory would be correct, as precedent does not clearly establish a hard cut-off time of 90 minutes (or less) for a brief detention. But the constitutionality of a detention's duration also depends on officer diligence. *See Sharpe*, 470 U.S. at 685–86; *Place*, 462 U.S. at 709. And it is clearly established that an officer may not delay a stop to conduct an investigative function if, through reasonable diligence, that task could have been performed earlier in the detention. *See Sharpe*, 470 U.S. at 685–86; *Place*, 462 U.S. at 709. To evaluate officer diligence, the 90-minute stop can be trisected into intervals of approximately 30 minutes.

Detective Gregory merits qualified immunity for the first approximately 30 minutes of the detention. In that time, the officers secured Summerville and Sirleaf, questioned them, and then conducted a consented-to vehicle search. Because those tasks

8

were not unduly delayed, the first third of the detention was not unreasonable, and the District Court erred in denying qualified immunity to Detective Gregory for that portion of the stop.

But after completion of those tasks, officers continued to detain Summerville and Sirleaf while Detective Gregory and another officer went to the mall security office to view a parking lot surveillance video. Detaining a suspect to review surveillance video is not categorically unreasonable. But here, that undertaking did not begin until 30 minutes into the stop, and the District Court found that, in the exercise of reasonable diligence, that task could have been performed sooner. *See Summerville v. Gregory*, 2019 WL 4072494, at *16 (D.N.J. Aug. 29, 2019) ("This record does not suggest any reason that this multi-officer team could not have checked the surveillance video . . . while Sirleaf and Summerville were being questioned."). But critically, the District Court did not make a specific finding as to Detective Gregory's personal involvement in that aspect of the delay. *See Grant v. City of Pittsburgh*, 98 F.3d 116, 126 (3d Cir. 1996) (requiring courts to "analyze separately, and state findings with respect to, the specific conduct of each individual [officer]"). Although a narrow, limited record review may occur on interlocutory appeal of a denial of qualified immunity, if it would be too cumbersome, this Court may vacate the order denying qualified immunity and remand for such findings. *See Williams v. City of York*, 967 F.3d 252, 258 (3d Cir. 2020). And here, it is too cumbersome to examine Detective Gregory's personal involvement in the delayed review of the surveillance video. A preliminary review suggests that, on the one hand,

9

Detective Gregory was in charge of the investigation,[1] but, on the other hand, he may have been instructed by a more senior officer on site to review the surveillance video.[2] Perhaps those differing accounts can be reconciled, but that task awaits the District Court on remand. And if on remand, the District Court finds that Gregory had the requisite personal involvement, it must still assess whether a reasonable officer with the information available to Gregory would have checked the video simultaneously with the questioning, and that determination may depend on when information became available to Gregory.[3] *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (explaining that objective reasonableness under the Fourth Amendment "will often require examination of the information possessed by the searching officials").

---

[1] *See, e.g.*, Friedenberger Depo. (JA193) (testimony from an officer on the scene that Gregory was the "trooper in charge"); Harrison Depo. (JA553 & 556) (testimony from the highest-ranking officer on location that Gregory was in charge of the investigation and that "[h]e was calling the shots"); Ciano Depo. (JA568) (testimony from a higher-ranking officer on site that Gregory was "the supervisor, the case agent for that investigation.").

[2] *See, e.g.*, Gregory Certification ¶ 19 (JA154) (stating that he was "directed" by a higher ranked officer on location, Detective Sergeant First Class Peter Ciano, "to proceed to the Mall's security office to check any surveillance video that could confirm or further dispel any suspicion that [Sirleaf and Summerville] were involved with Parker."); Ciano Depo. (JA165) (testimony from Ciano that he "instructed Gregory and [another officer] to watch the video . . . [to] make sure that [Sirleaf and Summerville] were involved"). *Compare* Defs.' Statement of Material Facts ¶ 53 (JA87) (stating that "[a]t the direction of [Detective Sergeant] Ciano, Detective[] Gregory and [the other officer] went to the Mall's Security office to review security camera footage"), *with* Pls.' Resp. to Defs.' Statement of Material Facts ¶ 53 (JA316) (admitting that statement and including supplemental facts about information that Gregory learned from reviewing the video).

[3] *Cf.* Ciano Depo. (JA165) (testimony from Ciano explaining that he instructed Gregory to watch the surveillance video because he had "done several jobs in the mall" and knew that it had a "good surveillance system.").

The final third of the stop involves the most delayed inquiry – the detention of Sirleaf and Summerville pending verification with the FBI's Joint Terrorism Task Force. The District Court did not make a specific finding of Detective Gregory's personal involvement in that detention. But for that aspect of his involvement, review of the record is not too cumbersome. *See Williams*, 967 F.3d at 258. After watching the surveillance video, Detective Gregory telecommunicated to the officers on the scene that Sirleaf and Summerville were free to go (unless the officers had, in the interim, discovered a reason to detain them). Upon receiving that message, Detective Friedenberger decided to continue the detention while he checked with the Joint Terrorism Task Force. Although nothing in the record justifies such a delay in initiating that inquiry, nothing in clearly established law subjects Detective Gregory to liability after he gave the order to release Sirleaf and Summerville.[4] To the contrary, it is generally understood that supervisors cannot be liable for violating a constitutional right absent their personal involvement in the wrongdoing. *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and [he or she] cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." (citations and internal quotation marks omitted)); *Rode v. Dellarciprete*,

---

[4] To be clear, nothing about this ruling necessarily condones Detective Friedenberger's decision to further prolong the stop; the basis for reversing is that without Detective Gregory's personal involvement in the final 30 minutes of the detention, his conduct did not violate clearly established law.

845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights case must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*.").[5]  Accordingly, the District Court erred in denying qualified immunity to Detective Gregory for the final approximately 30 minutes of the detention.

* * *

For these reasons, we reverse in part and vacate and remand in part the District Court's denial of qualified immunity to Detective Gregory.  He is entitled to qualified immunity for the decision to detain Sirleaf and Summerville as well as for the first 30 minutes and final 30 minutes of the 90-minute detention.  But for the middle 30 or so minutes of the stop, we vacate and remand for factual findings regarding Detective Gregory's personal involvement in the delay.

---

[5] *See also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017) (explaining that a *Bivens* claim – the federal analog to § 1983 suits against persons acting under color of state law – "is brought against the individual official for his or her own acts, not the acts of others"); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (explaining in the *Bivens* context that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct").