NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 25-2599
_____

UNITED STATES OF AMERICA

v.

PERNELL RIDDICK,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:23-cr-00182-001)
U.S. District Judge: Honorable Julia K. Munley
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 15, 2026
_____

Before: SHWARTZ, MASCOTT, and McKEE, <u>Circuit Judges</u>.

(Filed: May 19, 2026)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

SHWARTZ, Circuit Judge.

Pernell Riddick appeals the District Court's order denying his motion to suppress. Because reasonable suspicion supported stopping Riddick's vehicle, we will affirm.

I

A

During a face-to-face meeting, Corporal Matthew Nero[1] received information from a confidential source (the "CS")[2] that Amanda Petrizzo had a supplier who could deliver large quantities of methamphetamine on short notice. The CS did not know the supplier's name but described his car as a silver or champagne-colored Nissan Rogue and shared his physical attributes, which matched Riddick's description. Under Nero's supervision, the CS telephoned Petrizzo, and they agreed to meet at a local gas station at around 11:00 a.m. that day so the CS could purchase methamphetamine. The meeting did not occur that day, but the CS told Nero that she arranged for the sale to take place at the same time and place the following day. Three officers—Nero, Detective Sergeant Lucas Bray, and Detective Kyle Van Note—set up surveillance at the gas station the

---

[1] At the relevant time, Nero had been a police officer for nineteen years, a member of the Monroe County Drug Task Force for seventeen years, and a certified canine handler. He had received hundreds of hours of narcotics training, participated in hundreds of narcotics surveillance operations, and made several hundred narcotics-related arrests. His canine partner, Creed, was certified and trained to detect methamphetamine, cocaine, and heroin.

[2] Nero knew the CS had provided law enforcement with credible information in the past that led to the arrests and convictions of drug offenders.

following morning. Before arriving, they learned of an active warrant for Petrizzo's arrest.

Consistent with the CS's tip, at around 11:00 a.m., Petrizzo arrived at the gas station sitting in the passenger seat of a silver Nissan Rogue driven by a person, later identified as Riddick, who fit the physical description for Petrizzo's supplier the CS provided. Petrizzo briefly went into the gas station convenience store and returned to the vehicle, and it departed. Nero followed the car and learned that it was registered to Riddick and that the registration was expired. Bray saw that the vehicle appeared to have illegally tinted windows. Nero then activated his lights and sirens. After doing so, Nero saw Riddick (1) slow down to a near stop in the middle of the road, (2) appear to almost turn into oncoming traffic before pulling over onto a side road, and (3) make furtive movements in the vehicle toward either the center console or the backseat.

After the vehicle stopped, Nero approached Petrizzo, explained that she had an active arrest warrant, asked her to exit the vehicle, and placed her under arrest. Meanwhile, Van Note asked Riddick for identification, ran Riddick's criminal history, and learned that it included a robbery and several drug-related convictions. After speaking with Petrizzo, Nero asked Riddick to exit the vehicle and inquired whether there was anything illegal on his person or in the vehicle. Riddick said there was not and gave Nero permission to search the car. Nero's canine partner, Creed, who was already on scene, quickly alerted the officers to a controlled substance in the center console. Nero then began to search the vehicle and found a razor blade with white residue and an opened box of small plastic bags. Riddick thereafter withdrew his consent and Nero

3

stopped the search. Riddick was taken into custody.[3] The officers thereafter obtained a search warrant and found a hidden compartment in the car that contained methamphetamine, cocaine, fentanyl, a digital scale, two handguns (one of which was reported stolen), and $5,000.

B

Riddick was indicted for possession with intent to distribute cocaine, fentanyl, and over fifty grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and (C) (Count One), and possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count Two). Riddick moved to suppress the evidence found in the car.

At the suppression hearing, Nero testified about the events recited above. The District Court found Nero's testimony credible, concluded that Nero acted reasonably in stopping the vehicle and spending the time needed to investigate drug-related criminal activity, and denied the motion to suppress.

Riddick entered a conditional guilty plea to Count One and reserved the right under Federal Rule of Criminal Procedure 11(a)(2) to appeal the District Court's order

---

[3] Approximately thirty to forty minutes elapsed between the initiation of the stop and Riddick's arrest.

4

denying his suppression motion. The District Court sentenced Riddick to 180 months' imprisonment and four years' supervised release.

Riddick appeals the suppression ruling.

II[4]

A police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot" without violating the Fourth Amendment's prohibition against unreasonable seizures. Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "Reasonable suspicion requires only a particularized and objective basis for suspecting criminal activity" and can be based on an officer's training and experience that lead to "inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)); United States v. Johnson, 592 F.3d 442, 448-49 (3d Cir. 2010) (considering the "totality of the circumstances" to determine if traffic stop was supported by reasonable suspicion).

Here, reasonable suspicion supported the stop and subsequent search of Riddick's vehicle. Before the stop, the officers: (1) learned that the vehicle's registration was

---

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

"We review a District Court's denial of a motion to suppress for clear error as to the underlying facts, but exercise plenary review of the application of the law to the facts." United States v. Cortez-Dutrieville, 743 F.3d 881, 883 (3d Cir. 2014).

expired, (2) saw the car's illegal window tint,[5] and (3) had reasonable suspicion of drug-related activity based on the CS's tip.[6]

Because violations of the traffic laws due to the expired registration and possibly illegal window tint are self-evident, we focus our analysis on whether the officers had reasonable suspicion of drug activity before the stop. When officers rely on information provided by a source like the CS, "we must scrutinize the informant's 'veracity, reliability, and basis of knowledge.'" Johnson, 592 F.3d at 449 (quoting United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008)). To make this determination, we consider whether: (1) the information was given to the police face-to-face, allowing the officer to assess the source's credibility, (2) "the informant can be held responsible if her allegations are untrue," (3) the information would be known to the "ordinary observer," (4) the informant has

---

[5] The District Court correctly concluded that Rodriguez v. United States, 575 U.S. 348 (2015), was inapplicable because it applies to traffic stops "justified only by a police-observed traffic violation," id. at 350, and here, before the stop, the officer had observed traffic violations and reasonable suspicion of drug-related criminal activity.

[6] Although Riddick insists that the CS did not exist and thus there was no tip, the District Court found Nero's testimony about the CS and the information provided credible, and "[t]o the extent that the District Court's conclusions rested on credibility determinations, our review is particularly deferential." Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am., 609 F.3d 143, 156-57 (3d Cir. 2010). Riddick's key argument—that no documentation, such as contemporaneous notes, messages, or recordings, supported the existence of a confidential source—does not demonstrate that Nero's testimony was inherently inconsistent, incoherent, or implausible, and is thus insufficient to demonstrate clear error. United States v. Igbonwa, 120 F.3d 437, 441 (3d Cir. 1997) (stating that "when the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error"). Accordingly, we will defer to the District Court's factual finding that Nero received a tip from the CS.

actually witnessed criminal activity, and (5) the information provided "accurately predicts future activity." Id. "Though these factors all are relevant to our analysis, no single factor is dispositive or even necessary to render an informant's tip reliable," so "we must look to the totality of the circumstances to determine" whether the CS's tip had sufficient indicia of reliability to establish reasonable suspicion. Id.

The totality of the circumstances shows the CS's tip provided reasonable suspicion of drug-related activity. Nero had several opportunities to assess the CS's credibility because (1) he had previously received accurate information from her that led to other drug-related arrests and convictions, and (2) met with her in person when he received the tip at issue here. Nero also had the CS's contact information and thus had a way to hold her responsible if she provided false information. Moreover, much of the information that the CS provided, such as the existence of a secret compartment in Riddick's vehicle, would not have been known to the ordinary observer. Likewise, the CS accurately predicted that Petrizzo and Riddick would arrive at the gas station at 11:00 a.m. on the agreed-upon morning in a light-colored Nissan Rogue. Because the CS provided Nero with a credible tip regarding a planned drug sale by the occupants of the car, the officers had reasonable suspicion to stop the car and take time to investigate, including by searching the vehicle.[7] See United States v. Garner, 961 F.3d 264,

_____

[7] The reasonableness of the search was further bolstered by the fact that Nero did not begin to search the vehicle until Riddick consented and stopped the search when

7

271-72 (3d Cir. 2020) (concluding that hour-long stop and search of vehicle with dog sniff was sufficiently limited in scope and duration and did not violate the Fourth Amendment because there was reasonable suspicion). Thus, the stop and search comported with the Fourth Amendment.

III

For the foregoing reasons, we will affirm.

---

Riddick withdrew his consent. United States v. Williams, 898 F.3d 323, 329 (3d Cir. 2018) (explaining that a "search conducted with consent" is an exception to the rule that a search conducted without a warrant is presumptively unreasonable).