**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1707, 23-1802
_____

UNITED STATES OF AMERICA

v.

DEANDRE JACKSON & QUINTEL MARTINS
Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 2-21-cr-00054-001; 2-21-cr-00054-002)
District Judge: Honorable Juan R. Sanchez
_____

Argued on May 2, 2024

Before: KRAUSE, CHUNG, and RENDELL, *Circuit Judges*

(Opinion filed:  November 6, 2024)

Susan M. Lin                                **[ARGUED]**
Kairys Rudovsky Messing Feinberg & Lin

718 Arch Street, Suite 501 South
Philadelphia, PA 19106

*Counsel for Appellant DeAndre Jackson*

Todd R Fiore
Todd Fiore Law
834 Chestnut Street
Philadelphia, PA 19107

*Counsel for Appellant Quintel Martins*

Kevin L. Jayne                                    **[ARGUED]**
Sandra M. Urban
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____


KRAUSE, *Circuit Judge*.

We ask much of our law enforcement officials, whose daily responsibilities in maintaining order and public safety can expose them to great personal risk. So while the Fourth Amendment bars police officers from taking unnecessary or excessively intrusive measures in conducting investigative

2

stops, it allows them to take reasonable safety precautions commensurate with the danger they confront.

In this consolidated criminal appeal, Appellants DeAndre Jackson and Quintel Martins claim that officers took excessive safety measures in conducting an investigative traffic stop, so that the District Court erred in denying their motions to suppress evidence recovered from that stop. We cannot agree because, in the circumstances of the stop—in which an officer found himself alone in a dark corner of a high-crime neighborhood with three individuals he reasonably suspected were driving a stolen vehicle and attempting to evade him in the early hours of the morning—the precautions taken by that officer and those who immediately joined him at the scene were reasonable measures to ensure the suspects did not possess dangerous weapons and would not otherwise jeopardize their safety. Accordingly, we will affirm.

## I.    Background

### A.    Factual Background

At around 1:10 AM on the morning of October 2, 2019, Collingdale Police Officer Thayer McCauley was patrolling Delaware County, Pennsylvania with an unarmed trainee when he spotted a car with a broken taillight, a damaged Massachusetts license plate, and a scratched registration tag. He entered the car's information into a police database and learned that its registration was expired and that its license tag was not assigned to a particular vehicle make or model. Because those vehicle code violations indicated that the car might be stolen, Officer McCauley decided to conduct a traffic stop. The car he was driving was a conspicuously marked police car and when he pulled behind the vehicle, even before

3

he engaged his police siren, the driver immediately made a series of abrupt turns and sped off, going well over the speed limit of 15 miles per hour.  Even as the officer accelerated to over 30 miles per hour and even though this was a residential neighborhood, the vehicle quickly outpaced him and disappeared from view.

About forty minutes later, at around 1:50 AM, Officer McCauley saw the same vehicle traveling in the opposite direction.  He made a swift U-turn and continued in pursuit, but as he pulled behind it, the car immediately and abruptly turned into a vacant, dead-end lot.  Officer McCauley pulled behind the vehicle, blocking its exit from the lot.  At that point, Officer McCauley saw that there were three passengers in the car and realized for the first time that he was outnumbered, all the more so because the trainee who was with him was not only unarmed but also not permitted to engage with suspects.  Given his belief at that point that the driver had been attempting to evade him and that the car might be stolen, Officer McCauley decided to take certain safety precautions that accompany what his department colloquially called a "felony stop," meaning a stop for a suspected serious offense.  Specifically, Officer McCauley drew his firearm, pointed it at the vehicle, and ordered its three occupants (who police later identified as Appellant DeAndre Jackson, Appellant Quintel Martins, and Christopher Winfield) to put their hands out of their windows while he called for backup.

Within less than a minute, other officers arrived and likewise positioned themselves with their weapons drawn and pointed at the vehicle.  Officer McCauley then ordered each of the three suspects to exit the car, walk backwards towards the officers, and drop to their knees.  Martins, Winfield, and Jackson each complied and were handcuffed in turn.    Once

4

the suspects were secured and the officers confirmed that there were no other passengers in the car, they holstered their weapons.

Jackson was handcuffed by Deputy Kenneth Baker, who then did a "sweep" of Jackson's belt line for any sharp or dangerous weapons and felt a hard metal object in Jackson's right pocket. App. 295. When Deputy Baker asked about the object, Jackson explained that it was a gun magazine and informed Deputy Baker that there was a gun in the rear cup holder of the car. He also admitted that he did not have a concealed carry permit for the firearm.

When Deputy Baker returned to the car to remove the gun and clear its chamber, about three minutes after the stop began, he noticed "a fresh marijuana scent" in the backseat. *Id.* at 304. He alerted his colleagues, and the officers searched the car for evidence of illicit drug use. When they did not find any drugs or drug paraphernalia in the cabin of the car, the officers decided to search the trunk as well, noting that the smell was more potent "towards the back" of the vehicle. *Id.* at 305. There, the officers found a bag containing small vials, a scale, latex gloves, and a mason jar containing marijuana residue. They also found a second firearm and several articles of clothing, including multiple ski masks and bandanas, which matched the clothing worn by several men who had recently perpetrated a series of armed robberies. Finally, the officers recovered multiple cell phones from the vehicle, which would later reveal additional evidence connecting the men to the string of robberies.

In total, the investigative stop lasted about nine minutes. After their search, the officers arrested Jackson, Martins, and Winfield.

5

### B. Procedural Background

On February 25, 2021, a grand jury sitting in the Eastern District of Pennsylvania returned a five-count Indictment charging Jackson, Martins, and Winfield with: (1) conspiracy to interfere with interstate commerce by robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); (2) interference with interstate commerce by robbery and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) and 2 (Counts 2 and 4); and (3) using, carrying, and brandishing a firearm during and in relation to a crime of violence and aiding and abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Counts 3 and 5). Jackson and Martins both filed pre-trial motions to suppress the physical evidence that the officers recovered from their vehicle. In his motion, Jackson argued that: (1) the officers' investigative stop amounted to an arrest that was not supported by probable cause; (2) the stop was unreasonably prolonged beyond the time necessary for a valid traffic stop; and (3) the search of the vehicle's trunk was not supported by probable cause. Similarly, Martins argued that he was arrested without probable cause and that the officers did not have probable cause to search the trunk of the vehicle.

In response, the Government argued that the officers' measures were justified by the safety concerns that they reasonably harbored, that the officers did not unnecessarily prolong the stop, and that even if the officers did not have probable cause to search the trunk of the car, the search was still permissible under the automobile exception and as a search incident to an arrest. In a footnote, the Government also argued that "the evidence in the car would have been inevitably discovered" even if the officers had not searched the car during the traffic stop because "the car likely would have been towed and subject to an inventory search." App. 88 n.2. Finally, the

6

Government contended that Jackson lacked standing to raise a Fourth Amendment challenge to the officers' search of the vehicle because he was merely a passenger and did not have a legitimate expectation of privacy in the interior of the vehicle.

The District Court held a suppression hearing on April 1, 2022 and denied both motions to suppress. The Court determined that the traffic stop and the search were lawful, explaining that "[Officer McCauley] offered substantial justification for his suspicion that the Defendants may be armed, and given the circumstances of the stop, he took certain precautions to ensure his safety." *United States v. Martins*, No. 21-54, 2022 WL 2805328, at *5 (E.D. Pa. July 15, 2022). In so concluding, the Court credited Officer McCauley's testimony that he observed multiple "traffic code violations," including the broken taillight and expired registration; that the area where he stopped the vehicle was "dark, secluded" and was known to him as one where "criminal activity . . . sometimes occurred"; and that the suspects outnumbered him. *Id.* at 4. The Court further determined that the officers had probable cause to enter and search the vehicle because Jackson admitted that there was an illegal firearm in the car and because the officers credibly testified that they smelled marijuana once they entered the vehicle. The Court did not discuss the Government's argument that Jackson lacked standing to raise his Fourth Amendment claim or its contention that the evidence would have inevitably been discovered.

On November 29, 2022, Jackson pleaded guilty to Counts 1, 2, and 4 of the Indictment, preserving his right to challenge the Court's denial of his motion to suppress. The District Court sentenced him to 84 months in prison and a three-year term of supervised release. A month later, Martins pleaded guilty to all five counts of the Indictment, similarly

7

preserving his right to challenge the Court's denial of his motion to suppress. The Court sentenced Martins to 186 months in prison and a five-year term of supervised release.

In this timely consolidated appeal, Martins and Jackson ask us to reverse the District Court's order denying their motions to suppress and to vacate the Court's judgment.

## II. Jurisdiction and Standard of Review

The District Court had original jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291. In a challenge involving a district court's denial of a motion to suppress, we exercise plenary review over the court's legal conclusions, but we review the court's factual findings only for clear error. *See United States v. Delfin-Colina*, 464 F.3d 392, 395–96 (3d Cir. 2006).

## III. Discussion[1]

The Fourth Amendment prohibits "unreasonable searches and seizures," U.S. Const. amend. IV, and generally requires that evidence obtained as the result of an unlawful search or seizure be suppressed as "fruit of the poisonous tree," *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *United States v. Alexander*, 54 F.4th 162, 170 n.11 (3d Cir. 2022). A traffic stop of a vehicle is a seizure of the vehicle's occupants that is presumptively unreasonable unless it is "effectuated

---

[1] Having reviewed the District Court's relevant factual findings, we determine that none are clearly erroneous. Indeed, Appellants do not appear to argue on appeal that any of its findings were in error. Thus, we will rely on the District Court's findings of fact in the discussion that follows.

8

with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). Under the "narrowly drawn" exception to that requirement that the Supreme Court set forth in *Terry v. Ohio*, 392 U.S. 1, 27 (1968), however, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

In assessing the lawfulness of a *Terry* stop, "our inquiry is a dual one." *Terry*, 392 U.S. at 19–20. First, we must determine whether the stop was "justified at its inception—that is, whether the stop was supported by reasonable suspicion at the outset." *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (internal quotation marks and citations omitted). Second, because "[a] *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution," we must also determine "whether the manner in which the stop was conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 451, 452 (internal quotation marks and citations omitted).

On appeal, Jackson and Martins concede that the officers had reasonable suspicion to initiate a *Terry* stop of their vehicle, but they argue that the officers executed the stop in an unreasonable manner by holding them at gunpoint, forcing them to kneel, handcuffing them, and frisking Jackson when the officers had no reason to believe that any of the suspects were armed and dangerous. We disagree.

9

## A. Standing

Before we turn to the merits of Appellants' Fourth Amendment claims, we address the Government's contention that Jackson and Martins lack standing to challenge the officers' conduct. In order to challenge a search or seizure under the Fourth Amendment, "a person must have a cognizable Fourth Amendment interest in the place searched." *Byrd v. United States*, 584 U.S. 395, 410 (2018). Such an interest exists only when the defendant has a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).[2]

The Government argues that neither Appellant has standing to make their Fourth Amendment claims. First, the Government argues that Jackson does not have standing to challenge the officers' search because he was not the owner or the driver of the vehicle and therefore "had no privacy interest in the car or its contents." Answering Br. 42. But this argument misunderstands the nature of Jackson's claim. It is true that "[p]assengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding." *United States v. Mosley*, 454 F.3d 249, 253–54 (3d Cir. 2006). But where, as here, a defendant is

---

[2] As the Supreme Court has clarified, "standing" in the Fourth Amendment context "should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." *Byrd*, 584 U.S. at 410–11. Instead, "Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine," and "is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id.* at 411.

arguing that police officers executed a traffic stop in an unreasonable and unlawful manner, "the violation of [the defendant's] Fourth Amendment rights was the traffic stop itself, and it is settled law that a traffic stop is a seizure of everyone in the stopped vehicle." *Id.* at 253 (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

Put differently, Jackson's Fourth Amendment challenge "is about an illegal seizure by the police of the defendant, pursuant to which evidence was discovered[,]" *id.*, and he has standing to make that challenge because the traffic stop was a seizure of *all* of the vehicle's occupants, *see Brendlin v. California*, 551 U.S. 249, 259 (2007) (noting that "[i]f either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit" (internal quotation marks and citation omitted)); *see also Mosley*, 454 F.3d at 253 (noting that "passengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine").

The Government's contention that "Martins does not have standing . . . to assert Fourth Amendment rights over a magazine in Jackson's pocket, nor the gun found in the backseat," Answering Br. 40 n.7, fails for the same reason.[3]

_____

[3] Even if we found the Government's reasoning persuasive, the Government forfeited this argument because it did not challenge Martins' standing before the District Court. *See United States v. Jackson*, 849 F.3d 540, 550 n.7 (3d Cir. 2017) (explaining that, unlike arguments about Article III standing,

11

Though Martins may not have had a direct privacy interest in the magazine or the gun, he has standing to challenge the officers' seizure of the vehicle, and he may argue that the magazine and gun were fruits of that unlawful seizure. *See Brendlin*, 551 U.S. at 259; *Mosley*, 454 F.3d at 253. Accordingly, both Appellants have standing to assert their Fourth Amendment claims, and we now turn to the merits of those two claims.

## B.    The Investigative Stop

A *Terry* stop that is supported by reasonable suspicion at its inception "may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *Johnson*, 592 F.3d at 451. To ascertain whether a stop was excessively intrusive, we "review the manner in which the . . . police conducted the *Terry* stop at issue . . . to determine whether it was reasonably related in scope to the initial justification for the stop and the officers' legitimate concerns for the safety of themselves and the general public." *Id.* at 452. Here, Appellants argue that the Collingdale officers executed the investigative stop in an unreasonable and excessively intrusive manner by holding them at gunpoint,

arguments challenging standing to raise a Fourth Amendment claim are "waivable" because "standing in the Fourth Amendment context is shorthand for a legitimate expectation of privacy and is not a jurisdictional requirement to pursue an argument" (internal quotation marks and citations omitted)); *see also United States v. Dupree*, 617 F.3d 724, 732 (3d Cir. 2010) (rejecting the Government's "novel and interesting legal argument" under Federal Rule of Criminal Procedure 12(e) because "it was never raised in the District Court" and was therefore "waived").

forcing them to kneel, handcuffing them, and frisking Jackson when the officers "knew only that the vehicle had a broken taillight and an expired Massachusetts registration that was not associated with a particular car" and "had no reason to believe the individuals were armed and dangerous." Jackson Opening Br. 21–22. But this account of the stop largely ignores the fraught context surrounding Officer McCauley's decision to conduct a "felony stop," and it fails to consider the totality of the circumstances that the officers were facing based on the factual findings of the District Court.

As the Supreme Court has long recognized, "roadside encounters between police and suspects are especially hazardous." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). An officer who approaches a suspicious vehicle has no way of knowing who or what he will find behind the wheel and necessarily exposes himself to a danger of attack. *See United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) ("The Supreme Court has repeatedly recognized that traffic stops are dangerous encounters that result in assaults and murders of police officers."). That danger is "likely to be greater when there are passengers in addition to the driver in the stopped car." *Maryland v. Wilson*, 519 U.S. 408, 414 (1997). Our Constitution does not require officers to turn a blind eye to this inherent danger and uncertainty; rather, an officer conducting an investigative stop may take "necessary measures" to "assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Johnson*, 592 F.3d at 452 (quoting *Terry*, 392 U.S. at 23).

Even relatively intrusive police measures, like holding a suspect at gunpoint or handcuffing him, are not unreasonable per se. *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir.

13

1995); *see also United States v. Foster*, 891 F.3d 93, 107 (3d Cir. 2018) (explaining that "placing [the suspect] in handcuffs while confirming that he was not armed and dangerous was not outside the scope of a reasonable *Terry* stop"). Instead, we must decide whether "the use of guns and handcuffs [is] justified by the circumstances that authorize an investigative detention in the first place." *Johnson*, 592 F.3d at 452–53 (internal quotation marks and citation omitted). Similarly, a police officer conducting an investigative traffic stop "may conduct a reasonable search for weapons for his or her own protection without violating the Fourth Amendment." *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000). Like the use of guns and handcuffs, a frisk is justified when an officer has reason to think that he "is dealing with an armed and dangerous individual." *Id.* (quoting *Terry*, 392 U.S. at 27).

The touchstone of this inquiry is "the overall reasonableness of [the officer's] conduct in light of all the circumstances." *Johnson*, 592 F.3d at 452. Importantly, the officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. In reviewing an officer's decisions, we "should not indulge in unrealistic second-guessing," *United States v. Sharpe*, 470 U.S. 675, 686 (1985), and we must "consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior," *Robertson*, 305 F.3d at 167.

We confronted a similar Fourth Amendment challenge in *United States v. Johnson*. In that case, we held that police officers did not execute a *Terry* stop in an unreasonable or excessively intrusive manner when they surrounded a vehicle,

14

drew their weapons, and handcuffed the vehicle's occupants because "the officers had specific, reliable facts indicating that at least one of the [vehicle's] occupants had been involved in a shooting just minutes before." *Johnson*, 592 F.3d at 453. We explained that "[a]n officer with reasonable suspicion that the occupants of a vehicle are armed and dangerous does not act unreasonably by drawing his weapon, ordering the occupants out of the vehicle, and handcuffing them until the scene is secured." *Id.*

The investigative stop conducted by the Collingdale police officers likewise was supported by reasonable suspicion and therefore did not violate Appellants' Fourth Amendment rights. As the District Court found, Officer McCauley "reasonably believed the car was evading him" and "offered substantial justification for his suspicion that the Defendants may be armed," necessitating "precautions to ensure his safety." *Martins*, 2022 WL 2805328, at *5. We cannot unsettle these findings unless the District Court's account of the evidence is not "plausible in light of the record viewed in its entirety" or we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Williams*, 898 F.3d 323, 329 (3d Cir. 2018). Applying that deferential standard, we agree with the District Court that Officer McCauley's decision to conduct a "felony stop" was justified by a reasonable fear that the vehicle's occupants were armed and dangerous. First and foremost, Officer McCauley reasonably believed that he was pursuing a stolen vehicle, not only because the car had an expired registration and mismatched tag but also because of the evasive maneuvers that the driver took when Officer McCauley pulled behind him in a fully marked police car.

15

As a number of our Sister Circuits have recognized, "car theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize police officer safety." *United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007) (Kavanaugh, J.); *see also United States v. Hanlon*, 401 F.3d 926, 929 (8th Cir. 2005) ("[W]hen officers encounter suspected car thieves, they also may reasonably suspect that such individuals might possess weapons." (internal quotation marks and citations omitted)); *United States v. Bradley*, Nos. 89-6299 & 89-6530, 1990 WL 124205, at *2 (6th Cir. Aug. 27, 1990) (per curiam) (holding that officers were "justified in frisking both the driver and passenger of the car that they believed to have been recently stolen" because it was reasonable for them to believe that a person "suspected of having recently been involved in a car theft[] might have been armed and dangerous"); *United States v. Williams*, 7 F. App'x 876, 885 (10th Cir. 2001) (explaining that it was permissible to frisk a driver suspected of stealing a van); *but see Green v. City & Cnty of San Francisco*, 751 F.3d 1039, 1048 (9th Cir. 2014) ("The fact that [the suspect] was stopped on suspicion of a stolen vehicle does not by itself demonstrate that she presented a danger to the officers.").

But we need not decide today whether a suspicion of car theft, standing alone, establishes a reasonable basis to believe that a suspect is armed and dangerous because the totality of the circumstances surrounding Officer McCauley's investigative stop gave him ample additional reasons to fear for his safety. As the District Court explained, Officer McCauley encountered the suspects in the middle of the night in a dangerous, high-crime neighborhood. As soon as he attempted to pursue them, the suspects drove erratically and unpredictably in what Officer McCauley reasonably concluded

16

were two attempts to evade him. When he first pulled behind them in his fully marked police car, the suspects sped forward and made multiple quick, evasive turns until he lost sight of them; the second time, after Officer McCauley made a wide U-turn to pull behind them, the suspects immediately turned off of the main road into an abandoned lot from which there was no other exit. At that point, it was 1:50 AM, and Officer McCauley found himself outnumbered in a dark corner of a dangerous area. Based on his extensive experience patrolling the area, Officer McCauley was familiar with "the neighborhood, the residences, and the type of criminal activity," and the District Court reasonably credited his assessment about the dangerous circumstances he faced. *Martins*, 2022 WL 2805328, at \*4.

Under those conditions, any reasonable officer in Officer McCauley's position would have been apprehensive about approaching the vehicle alone. *See United States v. Brown*, 159 F.3d 147, 149–50 (3d Cir. 1998) (concluding that flight from police and presence in a high-crime area provided reasonable suspicion for a traffic stop); *Foster*, 891 F.3d at 105–06 (considering the time of day that a traffic stop occurred and the number of people in the area in assessing the reasonableness of the stop); *see also United States v. Brooks*, 982 F.3d 1177, 1180 (8th Cir. 2020) ("[The defendant's] presence in the stolen vehicle coupled with the driver's recalcitrant actions during the stop reasonably prompted concerns as to officer safety and public safety . . . ."). Indeed, Officer McCauley, an eleven-year police veteran who had conducted approximately "800 to 1000" traffic stops, App. 196, explained during trial that he did not think it was wise to engage the vehicle's occupants alone in "some dark dead-end driveway," *id.* at 233.

17

That professional judgment did not run afoul of Appellants' constitutional rights—the Fourth Amendment does not require police officers to wade recklessly into danger, nor does it demand that officers wait until they are certain a suspect is armed and dangerous before taking reasonable measures to protect themselves from potential harm. *See Kithcart*, 218 F.3d at 219 (noting that "an officer need not be absolutely certain that the individual is armed so long as the officer's concern was objectively reasonable" (internal quotation marks and citation omitted)). Assessing the totality of the circumstances that he faced, we conclude Officer McCauley had good reason to fear for his safety and permissibly took "necessary measures to determine whether [the suspects were] in fact carrying a weapon and to neutralize the threat of physical harm." *Long*, 463 U.S. at 1047 (quoting *Terry*, 392 U.S. at 24).

Despite these charged circumstances, Appellants contend the officers did not have a sufficiently particularized, objective basis to fear that they were armed and dangerous. First, they make much of Officer McCauley's testimony that he "had no reason to believe that the occupants of the car were armed and dangerous" before he initiated the stop. App. 277. But Officer McCauley also testified that he was "concerned about the behavior of th[e] car before [he] stopped it," App. 288, and that he only chose to conduct a "felony stop" because he was "concerned about officer safety," *id.* at 199. And he explained based on his extensive law enforcement experience that "approaching [a] vehicle by yourself, especially not knowing what's inside the vehicle, could be dangerous," especially when the officer is "investigating [a] serious crime." *Id*. Officer McCauley also testified that, by the time that he caught up to the suspects here, this danger was heightened

18

because "we're in essentially now some dark dead-end driveway and I'm essentially by myself." *Id.* at 233.

In any event, the question we must answer is not whether the particular officer conducting the stop subjectively feared for his safety, but whether "a reasonably prudent [officer] would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. The Fourth Amendment does not turn on the subjective intentions or dispositions of particular officers, but instead "allows certain actions to be taken in certain circumstances, *whatever* the subjective intent" because "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (cleaned up); *see also Scott v. United States*, 436 U.S. 128, 137–38 (1978) (recognizing that "it is imperative that the facts be judged against an objective standard," "without regard to the underlying intent or motivation of the officers involved," and that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (internal quotation marks and citation omitted)). Accordingly, "we are not limited to what the stopping officer says or to evidence of his subjective rationale." *United States v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000) (internal quotation marks and citation omitted).

Here, Officer McCauley's subjective belief that the suspects were not armed or dangerous did not "negate the reality that [they were] acting erratically and somewhat aggressively throughout the . . . evening" and therefore posed

a serious risk to officer safety. *Id.* That is because an officer's bravado cannot transform a lawful stop into an unlawful one, and a particularly courageous officer "should not be penalized because he did not provide a very sensationalized version of the facts in order to shore up his justification for" his conduct. *Id.* And for that reason, courts of appeals have upheld the lawfulness of protective frisks and searches even when the detaining officers did not subjectively fear that they were in danger. *See, e.g.*, *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (explaining that a protective frisk was justified "even if [the officers] did not subjectively fear [the defendant] was armed when they announced that they intended to frisk him, because the legitimacy of their search stemmed at all times from whether a protective frisk was objectively reasonable under the circumstances"); *Brown*, 232 F.3d at 594–95 (observing that the detaining officer was "[p]erhaps . . . not the type of officer who can articulate readily his sense of fear or perhaps his own particular disposition makes him less forthcoming about these potentially dangerous situations," yet holding that "a reasonable police officer would have wondered whether [the suspect] posed a threat to himself or herself or others.").

We too must assess the circumstances that the officers faced "against an objective standard" and ask whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate." *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004) (internal quotation marks and citation omitted); *see also Brown*, 232 F.3d at 594 ("[W]e look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." (internal

20

quotation marks and citation omitted)). We consider the objective circumstances surrounding the investigative stop, such as the time of night when Officer McCauley encountered the car, whether the neighborhood he was patrolling was particularly dangerous or "relatively crime-free," and any evasive or suspicious conduct that the officers witnessed. *Foster*, 891 F.3d at 106. And for the reasons explained, a prudent officer in Officer McCauley's position would have reasonably feared that the suspects were armed and dangerous based on those objective factors.

Second, Appellants argue that Deputy Baker's frisk of Jackson violated the Fourth Amendment even if the rest of the investigative stop did not because, by the time the pat-down occurred, the officers had no reasonable basis to suspect that Jackson was armed or dangerous.[4] They emphasize that

---

[4] We do not agree with the Government's contention that Appellants forfeited their separate argument concerning Deputy Baker's frisk because they did not challenge the frisk in their suppression motions before the District Court and "[o]nly on appeal, for the first time, did Jackson argue that an officer's safety frisk of him was not supported by reasonable suspicion[.]" Gov. Suppl. Letter Br. 2 (May 31, 2024). After all, Deputy Baker's account of the frisk only emerged during his testimony at the suppression hearing and, though a close call, we conclude that Appellants' challenge to the frisk at that point was sufficient to "put the District Court on notice of the legal argument." *Lark v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 596, 607 (3d Cir. 2011). Still, the tendency of both parties to merge the Fourth Amendment analyses of the stop and the frisk is understandable as both occurred in a continuous course of conduct, within the same few minutes, and, as we explain

21

Jackson had complied with all of the officers' orders and that Deputy Baker only frisked Jackson because he "usually" did so after handcuffing suspects who might "have needles or anything in their pocket of that nature" that could "stick you," App. 294–95, not because he had a specific or particularized belief that Jackson was armed. But again, we apply an objective standard, not a subjective one, and while we consider the lawfulness of a traffic stop at each step, including whether a frisk is justified by reasonable suspicion, *see Moorefield*, 111 F.3d at 12, the circumstances of that stop necessarily inform the reasonableness of an attendant frisk.

Where, for example, officers observe a traffic infraction but have no reasonable basis to believe that the vehicle's occupants are armed or dangerous before they conduct the stop, we require the officers to point to "behavior . . . consistent with the behavior of a person trying to conceal something." *Id.* at 14. But where, as here, an officer reasonably fears that a suspect is armed and dangerous *before* initiating the stop, and the occupants have already taken steps "consistent with the behavior of a person trying to conceal something" by attempting to evade the police, *id.*, that fear is no less reasonable when the suspect steps outside the car than when he stays inside. Here, only two minutes had elapsed between the beginning of the stop and Deputy Baker's frisk. The officers' reasonable fear that the suspects were armed and dangerous did not dissipate in that time simply because the suspects had exited their vehicle. Particularly where police officers are forced to "act[] in a swiftly developing situation," we will not

below, the danger informing the frisk arose directly from the circumstances preceding the stop.

"indulge in unrealistic second-guessing." *Sharpe*, 470 U.S. at 686.

Nor was Deputy Baker's protective frisk for weapons unlawful simply because Jackson had complied with the officers' instructions and was handcuffed at the time when the pat-down occurred. As we have recognized, it is simply untrue that "by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm." *United States v. Shakir*, 616 F.3d 315, 320 (3d Cir. 2010) (quoting *United States v. Sanders*, 994 F.2d 200, 209 (5th Cir. 1993)). To the contrary, "[h]andcuffs limit but do not eliminate a person's ability to perform harmful acts," *United States v. Pope*, 910 F.3d 413, 417 (8th Cir. 2018), which is why unsuspecting officers are assaulted and killed by handcuffed suspects every year, *see Shakir*, 616 F.3d at 321 (noting incidents of police officers killed by handcuffed suspects). That danger is of particular concern in the context of vehicle stops, where, as then-Judge Kavanaugh observed, "[e]very year . . . , about 6,000 police officers are assaulted—and about 10 officers are killed." *Bullock*, 510 F.3d at 349 (citing a 2006 FBI report on law enforcement officers killed and assaulted each year). And as these deadly hazards are "widely known to law enforcement personnel," *Sanders*, 994 F.2d at 209, we cannot say that Deputy Baker's decision to frisk Jackson, even after he was handcuffed, was an unreasonable protective measure, *see Shakir*, 616 F.3d at 320.[5]

---

[5] *See also United States v. Pope*, 910 F.3d 413, 417 (8th Cir. 2018) ("Though it is more difficult for him to do so, a person in handcuffs can still use a weapon to injure, and, of course, handcuffs can sometimes fail."); *Sanders*, 994 F.2d at 209 ("Albeit difficult, it is by no means impossible for a handcuffed

In sum, in conducting the stop of Appellants' vehicle, the Collingdale police officers did not take "any unreasonable steps in attempting to ensure that [they] would not become one of these statistics." *Bullock*, 510 F.3d at 349 (internal quotation marks and citation omitted). The District Court thus did not err in denying Appellants' motion to suppress.

## IV.   **Conclusion**

For the foregoing reasons, we will affirm the judgment of the District Court.

---

person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself."); *United States v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (noting that "suspects have been known to reach for weapons even when handcuffed").

**RENDELL**, *Circuit Judge,* dissenting:

In 1977, a divided Supreme Court permitted an officer to ask a driver to step out of a vehicle in a run of the mill traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam). The dissent vehemently opposed the Court's departure from "'the central teaching of this Court's Fourth Amendment jurisprudence'—which has ordinarily required individualized inquiry into the particular facts justifying every police intrusion—in favor of a general rule covering countless situations." *Id.* at 116 (Stevens, J.) (dissenting). Over the succeeding decades, we have "steadily increas[ed] the constitutional latitude of the police[.]" *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006). But today's opinion erodes Fourth Amendment protections beyond anything ever previously contemplated, giving police latitude to not only ask occupants to step out of the vehicle, but to do so at gunpoint, order them to walk backwards, kneel on the ground, handcuff them, and frisk them as a matter of course and without reasonable, particularized suspicion that they are armed and dangerous. The Fourth Amendment is meant to protect against such inappropriate intrusions by law enforcement. For that reason, I dissent.

When a police officer has a hunch that a car has been stolen, but has no reason to believe that the occupants of the car are armed or otherwise dangerous, what should he do? Presumably, he should wait for back up, as happened here, and then approach the car and ask the driver for his license and vehicle registration. What I suggest he is not permitted to do is have the occupants removed from the vehicle, put on their

1

knees and handcuffed, and then frisked. The record before us should leave little doubt that what the police did here in removing the occupants and handcuffing them was excessive, and the frisk that followed was totally beyond what the Fourth Amendment allows. Indeed, Officer McCauley repeatedly admitted that he did not have any reason to believe the defendants were armed and dangerous. Thus, all the evidence flowing from this Fourth Amendment violation should have been suppressed. Reading the majority opinion, I am left with the impression that we are looking at two different records. The record before us makes clear that what the police did was uncalled for.

I

I find it important at the outset to highlight a few facts in the record that were not the focus of the majority opinion, so as to paint the complete picture. The majority rightly points out that we review the District Court's factual findings for clear error. *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005). However, I urge that even with this heightened standard of review, the record speaks for itself, and the District Court erred in its relevant factual findings.

The majority affirms and relies on the District Court's factual findings that "Officer McCauley reasonably believed that he was pursuing a stolen vehicle, not only because the car had an expired and mismatched registration tag but also because of the evasive maneuvers that the driver took when Officer McCauley pulled behind him in a fully marked police car." Majority Op., Section III.B.

First and foremost, even under clear error review, few facts in the record support a "belief" that the car was stolen.

2

When Officer McCauley ran the license plate in his database, there was no report that the car was stolen. App. 254 ("The tag was not stolen status."); *see also* App. 263 (testifying that the vehicle's registration gave no indication that the car was stolen, that the owner of the vehicle had wanted cards, or indication of criminal record or gang activity). The car was registered to Cecil Johnson, Jr., for whom there were no warrants out for arrest. App. 255. The majority writes that the registration tag was "mismatched." Majority Op., Section III.B. Really, though, the record reflects that the registration tag was linked to *no* car, not that it was mismatched. App. 255 ("There was no make or model assigned to the registration."). Importantly, Officer McCauley testified that he was unaware of Massachusetts's registration procedures and if this was even unusual. App. 255. Nothing in the database supported a reasonable belief that the defendant's vehicle was stolen; a hunch, perhaps, but not a reasonable belief.

Second, the record does not support the majority's characterization that the driver of the vehicle "drove erratically and unpredictably" or Officer McCauley's belief that the driver was evading him. Majority Op., Section III.B. While Officer McCauley testified that he believed the Nissan was speeding, he did not clock the speed of the Nissan, could not say how fast it was going, and did not observe the Nissan running any stop signs or traffic lights. App. 127-30. The dashboard video from the first encounter with the vehicle does not corroborate Officer McCauley's testimony, and simply shows the officer turn onto the street after the defendants left the Wawa gas station. Gov't Ex. 1A at 00:48. He lost sight of the vehicle when it left the Wawa and spent 40 minutes trying to locate it. App. 217. The video does not depict the defendants' vehicle at all, much less does it capture the defendants "[speeding]

3

forward and [making] multiple quick, evasive turns." Majority Op., Section III.B. Rather, the video shows the officer driving erratically and unpredictably, through a very empty, quiet neighborhood. The officer's post hoc characterization is nothing more than that. Nor does the dashboard camera video for the second encounter show the driver driving erratically or evasively.[1] Quite the opposite, in fact. The video depicts the driver of the vehicle driving normally and *using his turn signal* before he turned into what turned out to be a dead-end street. App. 229-30, 258-60; Gov't Ex. 1B at 00:28. The officer never turned on his emergency lights or sirens to pull over the vehicle during either encounter,[2] and the officer was driving a slick top vehicle[3] at night. The objective evidence reveals nothing abrupt, erratic, or evasive in the driver's behavior.

The prosecution further insists, and the majority accepts, that the fact that the defendants turned into a "dark corner of a dangerous area" is further evidence that the

---

[1] Office McCauley testified that when he encountered the defendants' vehicle the second time, he "[did not] observe this motor vehicle engage in any motor vehicle code violations." App. 133.

[2] App. 231. Officer McCauley testified that he did not turn on his emergency lights during the first encounter with the vehicle, and regarding the second encounter, explained that he did not turn on his emergency lights because he "was trying to catch up to the vehicle." App. 231.

[3] "It's a slick top, so the light bar is located inside the vehicle. But it's equipped with a push bar and an LPR system." App. 252. Officer McCauley also testified that the silhouette of the top of the car lacks overhead lights. App. 272.

4

defendants were evading the police. Majority Op., Section III.B. But the record reflects, and Officer McCauley conceded, that at least two apartments have their entrances off this "alley:"

> Q: There's another vehicle there back—in, in the back in that street, correct?
>
> A: Right here, yes.
>
> Q: Correct. And that's because there are apartments, you said there are apartments right there?
>
> A: To the right.
>
> Q: Correct. And at this point, you did not know if Mr. Martins or any of the passengers were stopping to go into one of those apartments. Is that fair to say?
>
> A: Fair to say.
>
> Q: So other—I, I agree that it's late at night and the businesses are closed, but there is a potential legitimate purpose of turning onto that block to get, to, to access those apartments, correct?
>
> A: Correct.

App. 260. For all we know, the occupants could have been intending to visit someone or pick someone up from these buildings.[4]

This is the "totality" that the majority urges supported the officers' conduct that followed. Officer McCauley decided to make a "felony stop."[5] He pulled up behind the vehicle, instructed the occupants to put their hands in the air (which they did), and called for backup. Several officers arrived and the occupants complied completely when told to exit the vehicle, walk backwards, and kneel on the gravel until they were ultimately handcuffed. No behavior on the part of the occupants would give rise to a suspicion of danger or that crime was afoot. Rather, Office McCauley testified that the defendants were totally compliant.[6] Officer McCauley

---

[4] *See also* App. 146 ("Q: This is a residential neighborhood, correct? A: Correct.").

[5] Curiously, Officer McCauley testifies that when he first received the report back about the expired registration, he wanted to "conduct a traffic stop on the vehicle," App. 206, "to stop and ID" the driver, App. 105. And when he encountered the vehicle the second time, he again testified that he made a U-Turn to "conduct a traffic stop." App. 219. However, when he pulled up behind the vehicle, he began to "conduct a felony stop", App. 108, 231, which he testified is a stop for "investigating a serious crime," App. 199. There is nothing, other than perhaps his frustration at driving around for 40 minutes in order to locate the vehicle, that would cause him to conduct this more serious stop.

[6] Regarding the moments after he followed the vehicle and turned onto the street, Officer McCauley testified:

6

repeatedly testified that he had no reason to believe the occupants of the car were dangerous or armed.[7]

> Q: So it's not like the driver immediately turned off his vehicle and turned the lights off to try to avoid being detected by the lights of the vehicle. Is that fair?
> A: That's fair.
> Q: Okay. And nobody's bailing out of the car at this point and trying to flee from you, correct?
> A: That's correct.

App. 261. And when he initiated the stop:

> Q: Okay. You did not observe anybody in the vehicle committing any felonies, correct?
> A: That's correct.
> Q: You did not see any furtive movements from the passengers in the vehicles, correct?
> A: No, they were compliant.

App. 263-64.

[7] "Q: At that point in time, you had no reason to believe that the occupants of the car were armed and dangerous, is that correct? A: That's correct." App. 277; *see also* App. 140, 145-46, 264 ("Q: Would you agree with me that nowhere in [the incident report], does it say anything about officer safety? A: I, I don't have the [report] here, but I do not believe that was in there, no."). The majority urges that Officer McCauley's repeated admission that he had no reason to believe that the occupants were armed or dangerous is irrelevant because we use an objective standard, asking whether "a reasonably prudent [officer] would be warranted in the belief that his safety or that of others was in danger." Majority Op., Section

7

All we have, rather, is three Black men in a car, driving around at night. Yes, the car had a broken taillight, an out-of-state license plate, and a registration tag that had expired earlier that year and that was not linked to any vehicle—as Officer McCauley testified, "all infractions in Title 75 of the Vehicle Code." App. 216. There were no reports the vehicle was stolen and no warrants out for the owner of the vehicle.

The District Court and the majority have allowed the prosecution's gloss of events to obscure what really happened. What really happened was nothing very different from what would normally result in a routine traffic stop that could reasonably lead to further inquiry—as Officer McCauley himself seemed to acknowledge—not a "felony stop." *See* n.5, *supra*. Not only are the facts very clear, but the law regarding what police can and cannot do in such a situation is equally clear.

II

---

III.B (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). While we do use an objective standard when determining whether a suspect's Fourth Amendment rights were violated, certainly his perception of the situation informs this reasoning. Can we really determine that a "reasonably prudent officer" would believe a driver in this situation would be armed and dangerous, despite the fact that this officer—who the majority notes is a veteran officer who had conducted approximately 1000 traffic stops—testified under oath repeatedly that he had no reason to believe the occupants of the vehicle were armed and dangerous?

8

Some intrusions into personal liberties are so minor that the Supreme Court has held that they are always justified during a traffic stop given the need for officer and occupant safety. Specifically, officers can order both the driver and the passengers to step out of the car, an additional intrusion that has been characterized as "*de minimis.*" *Mimms*, 434 U.S. at 111; *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (extending *Mimms* to passengers).

But beyond the *de minimis* intrusions that are justified given the need for officer and occupant safety, the intrusiveness of the stop must be justified by the circumstances. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995); *see also Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996) ("Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment."). The drawing of a weapon and handcuffing constitutes a far greater intrusion on the occupants, and "remain[s a] hallmark of a formal arrest." *United States v. Patterson*, 25 F.4th 123, 143 (2d Cir. 2022) (internal quotations omitted). While there is no per se rule that drawing guns and handcuffing exceeds the bounds of a lawful *Terry* stop, the issue is whether, based on the totality of the circumstances, a reasonably prudent officer would be warranted in the belief that his or her safety, or that of others, was in danger. *Terry*, 392 U.S. at 27; *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000); *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000).

*Terry*'s reasonable suspicion standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Still,

9

an officer must articulate more than a mere "hunch." *Id.* at 124. We have justified the brandishing of a gun in stops where credible tipsters, informants, or other information in the record demonstrate that the occupants had been involved in a shooting, had a gun, or otherwise were involved in *violent* criminal activity. *See, e.g.*, *United States v. Torres*, 961 F.3d 618, 621 (3d Cir. 2020) (holding that the officer's brandishing a gun was justified when a witness flagged down a patrolling officer, pointed to the only pedestrian on a bridge, and told the officer that he had just watched the man pull out a gun and fire it twice into an old building). And while the majority is correct that we can rely on circumstantial evidence like the stop occurring in a high crime area at night or information from the officer's own training and experience, we can find no case— until today—that has justified the use of guns and handcuffs to expand the scope of a traffic stop absent specific and credible information about the occupant's involvement in violent criminal activity.[8]

---

[8] The caselaw is clear: reasonable suspicion of danger requires something more than just a hunch, a dark night, and a "crime-ridden" area. Most of the caselaw has held there was reasonable suspicion to draw a gun on a suspect at the stop because a tipster, informant, or incident report stated that the suspect was armed. *See, e.g.*, *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016) (officer received call from the nightclub about a threat of violence and had knowledge and experience with the nightclub and the surrounding area); *United States v. Edwards*, 761 F.3d 977, 982 (9th Cir. 2014) (defendant was the only person in the relevant vicinity who matched the description of a man reported to be shooting at passing cars just minutes before); *United States v. Windom*,

The majority relies on our opinion in *United States v. Johnson*, where we held that a *Terry* stop was not excessively intrusive even though the police response there was similar to the police response here. 592 F.3d 442 (3d Cir. 2010). But *Johnson* is actually the strongest case for the defense. There, as the majority notes, "the officers had *specific, reliable* facts indicating that at least one of the taxicab's occupants had been involved in a shooting just minutes before." *Id.* at 453 (emphasis added). A shooting had been reported by an eyewitness who had heard gunshots, called 911 and gave

863 F.3d 1322, 1333 (10th Cir. 2017) (officers received a tip that a suspect had flashed a firearm in public and proclaimed gang affiliation); *United States v. Elston*, 479 F.3d 314, 315-16 (4th Cir. 2007) (police responded to 911 call on a drunk driver who had a prior conviction of domestic assault and had threatened to use the handgun in his truck); *cf. United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004) (officer testified that because of his experience with dealing with individuals on PCP who "can be become extremely violent," he believed that the defendant, who smelled like PCP, was dangerous and used handcuffs to detain him).

On the other hand, some cases found brandishing guns unjustified when officers could point to no articulable facts that threatened their safety. In *United States v. Del Vizo*, the Ninth Circuit held that even though the officers suspected the defendant was a drug trafficker, because he was cooperative and officers had no reason to believe he was dangerous, handcuffing and brandishing guns was unjustified. 918 F.2d 821, 824-25 (9th Cir. 1990).

11

contemporaneous updates regarding the shootout, the location, and the direction the vehicle went. *Id.* at 445. The officers corroborated the tip when they saw the taxi driving in the direction and location the tipster identified. *Id.* at 450. We found that the seizure of the taxi and brandishing of weapons was reasonable under the circumstances but reached that conclusion because "[t]he officers responding to Anderson's 911 call reasonably suspected that the taxi's occupants had been involved in a physical altercation and shooting just minutes before." *Id.* at 453. We can only wonder as to why the majority relies on *Johnson* and question its failure to acknowledge that the "specific, reliable" facts in *Johnson* that made surrounding a vehicle, drawing weapons, and handcuffing occupants reasonable are totally lacking here. In *Johnson*, we specifically cautioned against police conduct that was more intrusive that necessary. *Id.* (affirming because the officers "took *only* 'such steps as were reasonably necessary'") (emphasis added). The officers' conduct here, without any reasonable suspicion that the occupants of the vehicle were armed and presently dangerous or had committed a crime, was clearly excessive.

The majority further urges that because the officer suspected that the vehicle was stolen, it was reasonable for Officer McCauley to believe that the occupants were armed and dangerous. Majority Op., Section III.B. Nonetheless, the majority cites to no case law in our Circuit for this proposition, and the cases from our Sister Circuits to which the majority cites have more evidence than here to support a reasonable belief that the car was indeed stolen.[9] The evidence

---

[9] *See United States v. Bullock*, 510 F.3d 342, 344 (D.C. Cir. 2007) (justifying a frisk of a suspect when the suspect made an

12

"supporting" a belief that the vehicle was stolen—namely, an out of state, expired tag—does not compare with the evidence in the cited cases. And Officer McCauley never asked the driver if he was or knew Cecil Johnson, Jr., to whom the car was registered. Further, the majority concedes that at least one of our Sister Circuits has held that suspicion a car is stolen is not enough *by itself* to give rise to reasonable suspicion that an occupant of a vehicle is armed and dangerous. *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1048 (9th Cir. 2014). So too here, particularly when that suspicion is no more than a hunch.

Given the facts in the record, the government has not justified the officers' use of guns and handcuffs here. There were several officers at the scene before the defendants were told to exit the vehicle. How could what the officers did thereafter be reasonable? The facts here are distinguishable from *Johnson*, which held that drawing guns and handcuffing the occupants of the car was reasonable. Our case law requires information beyond a "hunch" to establish a reasonable suspicion of violent activity. This can range from a credible tip to a specific 911 call with officer corroboration to an officer noticing, before the officer brandishes his weapon, that the suspect has a weapon or is otherwise evincing violent behavior. Nothing of the sort is present here. At the time of the escalation of the seizure, Officer McCauley had no articulable, reasonable

illegal turn, did not have registration, and could not identify the car's owner); *United States v. Hanlon*, 401 F.3d 926, 927 (8th Cir. 2005) (justifying a frisk when the suspect was shaking profusely, avoiding eye contact, and gave a story about purchasing the truck recently from a man in one town when the truck was registered to a woman in a different town).

suspicion that the occupants were a threat to his safety or that of the public. The majority cites numerous cases for isolated propositions regarding danger, suspicion, and objectivity but cites *no case* where a court has justified the excessive conduct that occurred here, following the relatively benign activity of the driver of the vehicle. In affirming the District Court, the majority would allow an officer to pull over any individual that committed a traffic violation at night in any one of a number of questionable neighborhoods and immediately brandish a weapon and handcuff the occupants of the vehicle. "[I]magine the general terror citizens of the United States would feel if this show of force by police was justified for minor traffic violations." Martins Br. at 11.

For these reasons, the traffic stop exceeded the scope justifiable under the Fourth Amendment and I would suppress all evidence found during the stop.

III

While I would hold that the conduct of the officers before Jackson was frisked was too intrusive given the facts, I would also hold, in the alternative, that it was in violation of the Fourth Amendment to frisk Jackson. That alone justifies the suppression of the evidence found thereafter. Officers may frisk a passenger of a car during a traffic stop only if they have a reasonable belief that the passenger is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009); *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). To justify the pat down of a suspect during a *Terry* stop, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *Mimms*, 434 U.S. at 111-12 (holding that viewing a bulge in the defendant's pants was

14

sufficient to provide reasonable suspicion that defendant was armed and dangerous). There is no requirement that the officer "be absolutely certain that the individual is armed." *United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) (quoting *Terry*, 392 U.S. at 27). Still, the officer must nonetheless point to "specific and articulable facts" warranting the pat down for weapons. *Id.* at 13 (quoting *Terry*, 392 U.S. at 21).

To justify a pat down during a *Terry* stop, the officer must be able to point to facts specific to the individual being frisked. While the totality of the circumstances can factor into whether the officer had reasonable suspicion that the individual was armed and dangerous, the Supreme Court has ruled presence in a "high crime area", standing alone, does not justify a frisk. *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990). Neither is the fact that an individual is present at a location where a constitutional search or seizure is taking place sufficient. *United States v. Murray*, 821 F.3d 386, 393 (3d Cir. 2016). Moreover, the officer's reasonable belief that the suspect is armed must arise prior to initiating the pat down. *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979).

The pat down here was unwarranted and unconstitutional. Officer McCauley did not (and cannot) point to any "specific and articulable" facts warranting a pat down. As noted above, he repeatedly testified under oath that he ***had no reason to believe that the occupants were armed and dangerous***. App. 140, 145-46, 277. A reasonable officer would have no basis to believe otherwise. There must be specific and articulable facts that would cause a reasonable person to believe, before the pat down occurs, that the defendant is armed and dangerous. McCauley cannot even say he had a *subjective* belief Jackson was armed and dangerous. Here, at the time of the frisk, Jackson had been fully compliant, was removed from

15

the car, kneeling on gravel, facing away from the officers, with his hands handcuffed behind his back. Any danger had, at the point of the frisk, been neutralized. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (outlining "objective reasonableness" standard for evaluating police use of force).

The pat down of Jackson, resulting in the discovery of the gun magazine in his pocket, led to search of the car. All the evidence found in the search of the car must be suppressed.

IV

Officer McCauley had a trainee in his car for the evening. A proper training exercise would have been to activate his lights, pull over the vehicle, and ask the driver for his license and registration. Instead, perhaps frustrated by having lost track of the vehicle and having searched for it for over half an hour, he violated the defendants' Fourth Amendment rights when, without a reasonable suspicion that the occupants posed a danger to him, he and several other officers surrounded them, with guns drawn, forced them out of the car and onto their knees, and handcuffed them and frisked Jackson. This was outside the scope of the "traffic stop" he should have conducted, and the evidence found thereafter should be suppressed.